IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LAURAL M. PALMER                                                    PLAINTIFF

VS.                                    4:11-CV-00444-BRW

CENTRAL FREIGHT LINES, INC.                                        DEFENDANT

<u>ORDER</u>

Pending is Defendant's Motion for Summary Judgment (Doc. No. 20).  Plaintiff has

responded, and Defendant has replied.[1]  For reasons set out below, Defendant's Motion is

GRANTED.

I.      BACKGROUND[2]

Defendant Central Freight Lines, Inc. ("CFL") is a less-than-truckload regional trucking

company headquartered in Waco, Texas.  CFL currently has 50 terminals, 2 of which are located

in the State of Arkansas -- one in Little Rock and the other in Fort Smith.  Defendant transports

shipments that are less than full truckloads from one customer to another.

Plaintiff Laural M. Palmer worked as an account manager at CFL's Little Rock terminal.

Her duties included creating and maintaining a customer base, and generating revenue from those

customers.  Palmer began working for CFL in 1992, but she left the company in August 2000 to

work as an account manager for a CFL-competitor (USF Dugan).  She returned to CFL in 2006.

When she returned, CFL agreed that Palmer's two periods of employment would be bridged --

giving her more seniority with the company.

---

[1]Doc. Nos. 25, 28.

[2]Unless noted otherwise, these facts are undisputed by the parties. *See* Doc. Nos. 22, 27.

When Palmer returned to CFL, the Little Rock terminal had only one account manager -- Ann Pace. Before working at CFL, Pace worked as an account manager with Palmer at USF Dugan. When Palmer joined Pace at CFL, Pace managed all the Little Rock terminal's customers, so the two met to divide them. Palmer and Pace agreed that each would manage certain geographic locations. The division was based largely on the territories that each managed while at USF Dugan. Although their sales territories generally were divided by geographical areas, each had various accounts in the other's territory.

In mid-2008, CFL began taking significant steps to remedy its financial troubles, which started in 2003 when the company first failed to make a profit. CFL decided that, to become profitable again, it needed to increase its shipping rates. It submitted a price increase to its largest customer (The Home Depot), which, at that time, accounted for nearly half of its daily shipments. The companies were unable to reach an agreement, and in late 2008, CFL learned that it would be losing The Home Depot's business in February 2009.

On May 30, 2008, Pace was discharged. A few days later, Corey Stephens (a male and approximately 30 years younger than Palmer and Pace) was hired to replace Pace as the second account manager at the Little Rock terminal. Stephens had worked with Palmer and Pace at USF Dugan. He began at USF Dugan as an office clerk and dockworker, but he was promoted to account manager to fill Pace's position when she left to work for CFL.[3]

Stephens was familiar with Pace's sales territory, so when he started at CFL, he managed the accounts that Pace had managed -- the area and customer division agreed to by Palmer and Pace remained the same.

---

[3]Doc. No. 1.

In August 2008, CFL hired Tom Botsios as vice president of operations to help reorganize the company.  As part of the reorganization, CFL implemented its first reduction in force ("RIF") in 2008 and laid off approximately 140 employees.  In October, Steve Holzhalb was hired as the terminal manger for CFL's Little Rock terminal, and Palmer and Stephens reported directly to him.  CFL then hired three new vice presidents of sales to supervise its three divisions.  Larry Mohr was hired in November 2008 as one of the new vice presidents, and supervised 27 account managers in CFL's Southwest and Central divisions. Stephens and Palmer began reporting to Mohr in December 2008.[4]  Mohr was Palmer's direct supervisor during the last year of her employment.

Mohr and the two other new vice presidents implemented new management tools aimed at increasing the account managers' accountability.  These new management tools consisted of individual-cycle-account lists and period-review reports.  They were designed to help account managers increase their revenues by identifying and targeting accounts with shipping potential, and to serve as performance measurements for account managers.

In early 2009, Stephens contacted Mohr about realigning his and Palmer's sales territories.  Stephens believed the division that Palmer and Pace had agreed to was unfair and he wanted to increase his sales territory.  Specifically, Stephens wanted two accounts (Siemens Industry, Inc., and Priority 1, Inc.) that were assigned to Palmer but located in his territory.  Mohr told Stephens that he should discuss the matter with Palmer.

Stephens contacted Palmer on March 9, 2009, and stated that he wanted to discuss a territory realignment.  Later that day, Palmer and Stephens met with Holzhalb and discussed realigning the sales territories.  The details of the meeting are disputed by the parties; it is

---

[4]At the time Stephens and Palmer began reporting to Mohr, Mohr was 55-years old.

undisputed, however, that following the meeting the southwest Little Rock territory was reassigned to Stephens, and the Maumelle territory was reassigned to Palmer.  Additionally, Palmer alleges that Holzalb made her choose between keeping either the Hot Springs territory or the Pine Bluff territory -- and faced with making a choice, she chose to keep Pine Bluff.  Palmer retained the Siemans and Priority 1 accounts.  The realignment became effective on March 10, 2009.

Despite the company's reorganization, CFL's financial troubles continued.  From January through March 2009, CFL laid off approximately 500 more hourly and salaried employees, reduced each terminal's customer-service staff, and changed 70 full-time positions to part-time positions.  In April, CFL implemented a performance-based salary reduction, under which employees classified as "underperforming" would receive a 10% salary reduction.  Botsios requested that each divisional vice-president submit a list of its least-performing employees.  In response, Mohr assessed the performance of the account mangers under his supervision by reviewing their performance data from January through March 2009.  Specifically, he reviewed the account mangers' average daily revenues and shipments, and information on their individual cycle accounts. Mohr identified six account managers that he believed were the poorest performers in his divisions.  Palmer was one of the six identified by Mohr, and all six had their salaries reduced by 10%.[5]

Also in April, CFL implemented a companywide salary freeze and laid off 65 more employees in another RIF.  CFL chose not to include the employees classified as underperforming in the April RIF.  Despite these measures, CFL was facing bankruptcy, and in

[5]At the time Palmer was listed as underperforming and included in the performance-based salary reduction, she was 62 years old.

4

May CFL laid off 40 more employees and implemented a companywide pay reduction (salaried employees had their salaries reduced by 10% and hourly employees' salaries were reduced by 5%).  Salaried employees hired after March 1, 2009 and employees who had received the performance-based salary reduction in April (such as Palmer) were not included in the pay reduction.  Stephens was included and his salary was reduced by 10%.  From June to September, CFL laid off 50 additional employees.

In late September, CFL determined that more cutbacks were necessary.  Either Botsios or Orr decided that the employees included in the April performance-based salary reduction that had not significantly improved their performance would be the first to be discharged.  Based on performance information submitted by Mohr, two account managers in Mohr's division were discharged in the October RIF -- Palmer and a 34-year old male account manager in El Paso, Texas.  In addition to discharging Palmer and the other employees whose performance had not significantly improved since the April performance-based salary reduction, CFL made other head-count and cost-reductions during the October RIF.  In all, CFL laid off 23 hourly and salaried employees, including employees that were not in the April performance-based salary reduction.

Since Palmer's discharge, there has been only one account manager at CFL's Little Rock terminal -- her former position has not been filled.  Before the October RIF, 75% of CFL's account managers were over age 40, and afterwards, 75% are over 40.

After Palmer was discharged, CFL continued to lay off more employees through December 2010.  In all, CFL discharged approximately 770 employees from 2008 through 2010 in various RIFs, and all its employees had their pay reduced.

On November 4, 2009, Palmer filed a Charge of Discrimination against CFL with the

EEOC.[6]  The EEOC issued her a Right to Sue letter on March 29, 2011.[7]  Palmer sued CFL,

claiming that CFL reduced her sales territory and salary, and then discharged her, based on her

age and gender, in violation of the Age Discrimination Employment Act of 1967[8] ("ADEA"),

Title VII of the Civil Rights Act of 1964[9], and the Arkansas Civil Rights Act of 1993[10]

("ACRA").[11]

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so

that the dispute may be decided on purely legal grounds.[12]  The Supreme Court has established

guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the
> need for a trial -- whether, in other words, there are any genuine factual issues that
> properly can be resolved only by a finder of fact because they may reasonably be
> resolved in favor of either party.[13]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an

extreme remedy that should be granted only when the movant has established a right to the

---

[6]Doc. No. 20, Ex. 7.

[7]*Id.*

[8]29 U.S.C. § 621 *et seq.*

[9]42 U.S.C. § 2000e *et seq.*

[10]Ark. Code Ann. § 16-123-101 *et seq.*

[11]Doc. No. 1.

[12]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

judgment beyond controversy.[14]   Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[15]   I must view the facts in the light most favorable to the party opposing the motion.[16]   The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.   It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.   Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.   If the respondent fails to carry that burden, summary judgment should be granted.[17]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[18]

## III.   DISCUSSION

### A.      Statute of Limitations

Palmer claims that the following three events violated the ADEA, Title VII, and ACRA: (1) the territory realignment; (2) her inclusion in the performance-based salary reduction; and (3) her discharge.   CFL argues that Palmer's ADEA and Title VII claims that are based on the territory realignment and salary reduction are time-barred because Palmer failed to exhaust her

---

[14]*Inland Oil & Transp. Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[15]*Id.* at 728.

[16]*Id.* at 727-28.

[17]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[18]*Anderson*, 477 U.S. at 248.

administrative remedies.  CFL contends (and Palmer concedes) that each of these events

constitutes a discrete act.[19]  Therefore, each was actionable on the date it occurred.[20]

For an ADEA or Title VII claim based on a discrete act to be actionable, the plaintiff

must have filed a charge of discrimination with the EEOC within 180 days of the act.[21]  Palmer

filed her charge of discrimination with the EEOC on November 4, 2009.[22]  Thus, the territory

realignment (March 9, 2009) and salary reduction (April 10, 2009) are not actionable under the

ADEA or Title VII.[23]  Palmer concedes that she cannot recover for these two events under the

ADEA or Title VII, but argues that I should consider them as evidence of discrimination.  The

Supreme Courts says this is permissible, but it is unclear how much weight I should give these

time-barred acts.[24]

As for Palmer's ACRA claims, they are subject to different time requirements.  First,

ACRA does not provide a cause of action for age discrimination -- thus, Palmer's ACRA claims

are confined to the alleged gender discrimination.[25]  For Palmer's ACRA claims to be timely, she

must have either filed her complaint within one year of the date the alleged employment

---

[19]Doc. Nos. 21, 26.

[20]See *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 670 (8th Cir. 2006); *Tademe v. St. Cloud State Univ.*, 328 F.3d 982, 987 (8th Cir. 2003).

[21]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("A discrete act . . . 'occurred' on the day it 'happened.' A party, therefore, must file a charge within 180 . . . days of the date of the act or lose the ability to recover for it.").

[22]Doc. No. 20, Ex. 7.

[23]*Morgan*, 536 U.S. at 113 ("First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

[24]*Id.* ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.")

[25]Ark. Code Ann. § 16-123-107(a).

discrimination occurred or within ninety days of receipt of her Right to Sue letter, whichever is later.[26]  Palmer filed her EEOC charge on November 4, 2009, received her Right to Sue Letter around March 30, 2011, and filed her Complaint on May 26, 2011.[27]  Thus, all three events -- as they relate to gender -- are actionable under ACRA.

### B.    Evidence of Employment Discrimination

A plaintiff alleging employment discrimination under the ADEA, Title VII, or ACRA, can survive summary judgment by either presenting direct evidence of discrimination,[28] or by "creating the requisite inference of unlawful discrimination" through use of the *McDonnell Douglas Corp. v. Green*[29] framework.[30]  If a plaintiff has "strong" evidence that the employer's adverse action was motivated by a discriminatory purpose, he or she need not use *McDonnell Douglas* to get to the jury.[31]

---

[26]*Id.* at § 16-123-107(c)(3).

[27]Doc. Nos 1 and 20, Ex. 6.

[28]See *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) ("[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. Thus, 'direct' refers to casual strength of the proof, not whether it is 'circumstantial' evidence.").

[29]411 U.S. 792 (1973).

[30]See *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012) (ADEA case); *Gibson v. American Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (Title VII and ACRA case).

[31]*Torgerson*, 643 F.3d at 1044.

Here, it does not appear that Palmer has strong evidence of discrimination -- nor does she claim to -- and the parties, in their briefs, analyze her claims under *McDonnell Douglas*.[32] Therefore, in determining whether CFL is entitled to summary judgment, I will do the same.[33]

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination.[34]  If the plaintiff does so, the defendant must then "articulate a legitimate, nondiscriminatory reason for its challenged action."[35]  If the defendant does so, any inference of discrimination disappears, and the plaintiff must then show that the defendant's stated reason is false.[36]  Under *McDonnell Douglas*, only the burden of production shifts between the plaintiff and defendant -- the burden of persuasion remains with the plaintiff throughout.[37]

I will assume that Palmer has established a *prima facie* case of both age and gender discrimination.[38]  So, I now look to CFL to rebut her case with a nondiscriminatory, legitimate

---

[32]Doc. Nos. 21, 26.

[33]*Torgerson*, 643 F.3d at 1044 (holding that employment discrimination claims based on circumstantial evidence are analyzed under *McDonnell Douglas* framework).

[34]*Ward v. Int'l Paper Co.*, 509 F.3d 457, 460 (8th Cir. 2007).

[35]*Id.* at 460.

[36]*Id.*

[37]See *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005).

[38]See *Bone*, 686 F.3d at 954 (assuming without deciding that plaintiff had met its burden). To establish a *prima facie* case of age discrimination under the ADEA in the context of a RIF, Palmer must show that she is over 40 years old, met the applicable job qualifications, was discharged, and some additional evidence that age was a factor in CFL's decision to discharge her.  *Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 637 (8th Cir. 2011); see also *Ward*, 509 F.3d at 460; *Chambers v. Metro. Prop. and Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003). Also, she must also show, by a preponderance of the evidence, that age was the "but-for" cause of her discharge.  *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011); see also *Gross v. FBL Fin. Serv's., Inc.*, 557 U.S. 167, 177 (2009).  Under ACRA and Title, to establish a *prima facie* case of gender discrimination she must show that she is a member of a protected class, was qualified to perform her job, was discharged, and treated differently from similarly situated

reason for its decision to discharge Palmer.[39]  CFL's burden at this stage is not arduous.[40]  If CFL

gives a legitimate reason for discharging Palmer that is not unlawful, I am not to determine

whether that decision was "wise, fair, or even correct, ultimately, so long as it truly was the

reason" Palmer was discharged.[41]  I look only to see if CFL's reason was honest -- i.e., whether it

can be supported by the facts.[42]

      CFL stated that Palmer was discharged in the October RIF because her performance did

not significantly improve after she received a performance-based salary reduction in April

2009.[43]  It is undisputed that Palmer had her salary reduced, and that, at the time she was

discharged she was not meeting her sales goals.  Thus, any presumption of unlawful

discrimination disappears.[44]  Palmer must now prove that CFL's stated reason is false by

demonstrating a material question of fact.[45]

---

males.  See *Hesse v. Avis Rent A Car System, Inc.*, 394 F.3d 624, 631 (8th Cir. 2005); *Gibson*, 670 F.3d at 854. And since she was discharged in a RIF, she must also "make some additional showing that gender was a factor in her [discharge]."  *Id.* at 631.

    [39]*Bone*, 686 F.3d at 954.

    [40]*Id.* at 954.

    [41]*Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998).

    [42]*Id.* at 873 (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)).

    [43]Doc. No. 21; See *Wittenburg v. Am. Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 836 (8th Cir. 2006); see also *Fast v. S. Union Co., Inc.*, 149 F.3d 885, 892 (8th Cir. 1998) (holding that discharge during a RIF is a legitimate, non-discriminatory reason); *Hardin v. Hussman Corp.*, 45 F.3d 262, 264 (8th Cir. 1995) (recognizing that a RIF is a legitimate reason for discharging an employee).

    [44]*Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011).

    [45]*Bone*, 686 F.3d at 955.

She may do this by showing that CFL's reason is "unworthy of creedance" because the facts cannot support it, or by persuading me that it's more likely that her age or gender motivated CFL's actions.[46]  Either way, she must show that her age or gender, rather than her performance, was CFL's motivation for discharging her.[47]  Palmer's burden at this point is to show me that she was the victim of intentional discrimination.[48]

## C.      Establishing Pretext

CFL stated that Palmer was discharged because of her poor performance.  Palmer disagrees that she was discharged for performing poorly, but argues that, if so, it was because her performance was hindered and unfairly measured based on her age and gender.  She argues it began with the territory realignment, which led to her performance-based salary reduction and eventually, her discharge.  As noted earlier, her ADEA and Title VII claims based on the territory realignment and salary reduction are not actionable.  Palmer, however, urges me to consider them as evidence of a continuing pattern of discrimination culminating in her discharge.  The Supreme Court says I may consider these untimely events "as background evidence" in support of Palmer's discharge claim.[49]  But, before I do so, I note that the weight I should give the two events is unclear, since that, on their own, they cannot support liability under the ADEA or Title VII.[50]

---

[46]*Torgerson*, 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006) (quotations omitted)).

[47]*Id.* at 1047.

[48]*Id.* (brackets omitted) (quoting *Torgerson*, 643 F.3d at 1046).

[49]*Morgan,* 536 U.S. at 113.

[50]See *Garcia v. Centerpoint Energy Res. Corp.*, No. 1:10-CV-00054-DPM, 2012 WL 892278 at *4 (E.D. Ark. Mar. 15, 2012).

This makes analyzing Palmer's discharge claim especially difficult because, other than Mohr's treatment of her and Stephens and CFL's length-of-service policy, Palmer primarily relies on the territory realignment and salary reduction to support her pretext-argument. Accordingly, I will consider her evidence and do my best to give it the weight it deserves.

Beginning with the territory realignment, Palmer claims that, because of her age and gender, 50% percent of her sales territory was taken from her and given to Stephens (a younger male). She primarily points to Mohr's actions and statements as evidence of this alleged discrimination. Specifically, she points to the following as evidence that Mohr intentionally discriminated against her: (1) Mohr's comment about age; (2) Mohr's treatment of her and Stephens during his visits to Little Rock; and (3) Mohr failure to investigate the realignment before approving it.

First, Palmer alleges that Mohr told her that he "helped a guy retire" because he could "hire two kids for the price of one."[51] This is the only alleged statement Palmer identified as indicative of age-bias.[52] She testified that there were other gender-related comments, but none that are relevant or made by Mohr.[53]

Mohr denies making this comment, and Palmer has not provided any evidence to support its truth. She does not dispute, however, that the only employee that reported directly to Mohr, and retired between December 2008 and September 2009, was an account manager in Houston,

---

[51]Doc. No. 25, Ex. 3.

[52]*Id.*

[53]During Palmer's deposition she testified that various other employees had made discriminatory remarks regarding her gender. However, because the statements were allegedly made by non-decisionmakers and Palmer did not allege a hostile work environment claim, they will not be considered. See *Wells v. SCI Mgmt, L.P.*, 469 F.3d 697, 701-02 (8th Cir. 2006).

and Mohr filled his position with a new hire that was 47 years old.[54]  Thus, even viewing the

disputed facts in Palmer's favor, this alleged comment is insufficient to support an inference of

discrimination, much less persuade me that Mohr intentionally discriminated against her because

of her age.[55]

    Second, Palmer argues that the disparity of Mohr's treatment of her and Stephens during

his visits to Little Rock shows that he was intentionally discriminating against her.  She concedes

that when Mohr visited Little Rock he would spend one day each with her and Stephens.[56]  Her

argument, however, is that Mohr spent his day with her making sales calls, but spent his day with

Stephens playing golf.  She also points out that Mohr called Stephens regularly about his

performance and how he could improve; that she was not afforded this luxury, Palmer argues,

shows discrimination.

    From the facts presented, I fail to see how Mohr's favorable treatment of Stephens is

evidence of age or gender discrimination -- it is not unlawful for an employer to favor an

employee because of a personal relationship.[57]  The fact that Mohr played golf with Stephens,

with or without customers, and not Palmer, does not show that he intentionally discriminated

---

[54]Doc. No. 27.

[55]See *Colder v. TCI Cablevision of Missouri, Inc.*, 298 F.3d 723, 730 (8th Cir. 2002)
(holding that comments that are remote in time and not repeated do not create a triable issue on
the question of pretext); *Clark v. Matthew Intern. Corp.*, 628 F.3d 462, 471 (8th Cir. 2010)
("[I]solated remarks regarding retirement and age generally are insufficient to prove age
discrimination, especially when it is unclear what context the statements were made in.");
*Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir. 1999) (holding that comments
that have no "casual link" to the decisional process are insufficient to establish discrimination).

[56]Doc. No. 27.

[57]See *Anderson v. Producers Rice Mill, Inc.*, No. 5:07-CV-00205-JLH, 2008 WL
2351037 (E.D. Ark. June 4, 2008) (holding that evidence that an employee was favored because
of a personal relationship tends to show that neither age or sex was the reason for the plaintiff's
discharge).

against her because of her age.  The purpose of Title VII and the ADEA is to prohibit

discrimination based on "certain, discreet classification" such as gender and age.[58]  "These

statutes do not prohibit employment decisions based upon poor job performance, erroneous

evaluations, personal conflicts between employees, or even unsound business practices."[59]  Any

favorable treatment, described by Palmer, that Stephens received cannot reasonably be ascribed

to gender or age-related discrimination.

Third, Palmer claims that Mohr intentionally discriminated against her by failing to

investigate the territory realignment before approving it.[60]  Stephens was the one who went to

Mohr, complaining about the territories being divided unfairly; Mohr merely told him to discuss

the issue with Palmer.[61]  Although Palmer now claims that the realignment was unfair, she agreed

to it.  Moreover, Mohr was not present for the meeting regarding the realignment.  Although

Palmer alleges that she questioned Mohr about adjusting her goals after the realignment, she

never claims to have communicated to Mohr that she was unhappy with the territory division.

Furthermore, the fact that Mohr did not investigate the realignment before approving it

does not raise an inference that he was intentionally discriminating against Palmer.  It is clear

from Palmer's testimony that CFL generally left the division of territories to the account

managers, or at least had an informal policy regarding such.[62]  It is undisputed that the territory

---

[58]*Haigh,* 632 F.3d at 470-71.

[59]*Id.* at 471 (quoting *Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997)).

[60]Doc. No. 26.

[61]Doc. Nos. 22, 27.

[62]Doc. No. 20, Ex. 3.

division before the realignment was not a product of CFL's doing or approval.[63]  According to

Palmer, the territory division before the realignment was the result of an agreement between her

and Pace.[64]  Although the territory realignment may have been unfair, the results are clearly not a

product of intentional, unlawful discrimination by CFL, Mohr, or any of Palmer's other

supervisors.

  Next, Palmer argues that the her inclusion in the April performance-based salary

reduction is background evidence of intentional discrimination.  She claims that Mohr classified

her as underperforming and included her in the salary reduction because of her age and gender.

Specifically, she points to the following as evidence that it was based on intentional

discrimination: (1) she and Stephens both failed to reach their sales goals but Mohr submitted

only her for the salary reduction; and (2) in determining that she underperformed, Mohr did not

consider that her sales territory was recently reduced.

  First, Palmer can show pretext by showing that she was treated differently from similarly

situated employees -- but she and Stephens were not similarly situated.[65]  Similarly situated

employees must be similarly situated in *all* respects.[66]  "At the pretext stage, 'the test for

determining whether employees are similarly situated to a plaintiff is a rigorous one.'"[67]  "The

individuals used for comparison must have dealt with the same supervisor, have been subject to

---

[63]Doc. Nos. 22, 27.

[64]Doc. No. 20, Ex. 3.

[65]*Martinez v. W.W. Grainger, Inc.*, 664 F.3d 225, 230 (8th Cir. 2011).

[66]*Amini v. City of Minneapolis*, 643 F.3d 1068, 1076 (8th Cir. 2011) (emphasis added).

[67]*Bone*, 686 F.3d at 956 (quoting *Rodgers*, 417 F.3d at 853.)).

the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."[68]

Stephens may have been similarly situated in many respects, but not *all*.  Stephens was with CFL for less than a year and had no previous performance issues.  Mohr understood this to mean that Stephens was not to be considered for the April performance-based salary reduction.[69] Palmer argues that Mohr's explanation is false because there is no written policy to support it.[70] Mohr's reasoning, however, is supported by Botsios's affidavit statements.  Botsios stated that he requested the vice-presidents, like Mohr, to submit the least performing employees along with "statistical justifications" for why those employees were selected.[71]  Moreover, personnel decisions need not be based on "a formal written policy."[72]  "An employer 'can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so.'"[73]

Here, Mohr identified six account managers in his division as underperforming -- four were male and three were under the age of 40.  Thus, Palmer has failed to show that she was treated differently because of her age or gender.

---

[68]*Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000) (quotations and brackets omitted)).

[69]Doc. No. 25, Ex. 1.

[70]Doc. No. 26.

[71]Doc. No. 20, Ex. 1.

[72]*Collins v. Henderson*, 180 F.3d 988, 990 (8th Cir. 1999).

[73]*Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 795 (8th Cir. 2011) (quoting *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1036 (8th Cir. 2005)).

Second, Palmer claims that Mohr intentionally discriminated against her because he did not consider that her sales territory was reduced when he submitted her as underperforming. Mohr selected which account managers would be included in the performance-based salary reduction based on their performance data from January through March 2009.  The majority of that time was before the realignment (which, again, she agreed to).  And, it is clear from the performance data submitted by Palmer that she did not reach her sales goals -- even before the realignment.[74]

The Eighth Circuit "has repeatedly held that [the court] is not a 'super-personnel department' and that it is not unlawful for a company to make employment decisions based upon erroneous information and evaluations."[75]  Assuming that Palmer was included in the salary reduction based on inaccurate performance reviews, without additional evidence that discrimination motivated the decision, she has not met her burden.

In fine, neither the territory realignment nor the salary reduction persuade me that CFL was intentionally discriminating against Palmer or show pretext.

Lastly, Palmer claims that she has established pretext by showing that her discharge violated CFL's length-of-service policy because, under its terms, Stephens should have been discharged before her.[76]  CFL's Employee Handbook states that if a workforce adjustment is necessary, employees under formal corrective action will be discharged first, followed by employees with the least amount of company service.[77]  CFL's Employee Handbook does not

---

[74]Doc. No. 25, Ex. 22.

[75]*Allen v. City of Pocahontas, Ark.*, 340 F.3d 551, 558 n.6 (8th Cir. 2003); see also *Clark*, 628 F.3d at 470; *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957 (8th Cir. 2001).

[76]Doc. No. 26.

[77]Doc. No. 25, Ex. 14.

define "formal corrective action."[78]   Botsios stated in his affidavit, however, that he considered the employees included in the performance-based salary reduction to be under formal corrective action for purposes of CFL's length of service policy.[79]

Palmer claims that Botsios's explanation is false because Mohr testified that at the time he selected her to be discharged in the October RIF he did not know whether the performance-based salary reduction constituted a disciplinary action.[80]   Whether Mohr considered the pay reduction to be a formal corrective action is irrelevant -- Botsios did, and he decided that those employees who had not significantly improved would be discharged first.[81]  Mohr simply reviewed the performance data of the six account managers in his division that were included in the salary reduction, and provided Botsios with the names of those he determined had not significantly improved.[82]   Palmer has not presented any specific, admissible evidence showing that the reasons given for her discharge are false and that she was intentionally discriminated against.

"An employer 'can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so.'"[83]   Here, it is clear from Palmer's performance data that her performance was not improving and she had

---

[78]Doc. No. 25, Ex. 20.

[79]Doc. No. 20, Ex. 1.

[80]Doc. No. 26.

[81]Doc. No. 27.

[82]Doc. Nos. 22, 27.

[83]*Barber*, 656 F.3d at 795 (quoting *Haas*, 409 F.3d at 1036).

consistently failed to meet her sales goals.[84]  It is also undisputed that two account managers in Mohr's division were discharged in the October RIF for failing to significantly improve their performances after having their pay reduced: Palmer and a 34-year-old male account manger.[85]

Palmer argues that this evidence is immaterial because the decision to discharge her was site specific -- i.e., between her and Stephens.  She cannot, however, establish pretext by comparing herself to Stephens because, again, he wasn't similarly situated.  Only the account managers included in the performance-based salary reduction were considered, and Stephens was not included in the salary reduction.  A similarly situated employee, here, would be  an account manger who was under Mohr's direct supervision, included in the performance-based salary reduction, and identified as having failed to significantly improve.  Palmer must then show that the account manger was outside of her protected class and not discharged.  She has failed to produce such evidence.

Even assuming that Palmer and Stephens were similarly situated, "[i]n the context of a RIF, age discrimination cannot necessarily be inferred from the fact that an employer retained younger employees."[86]  "This is especially true . . . where the employer has retained the younger employees to perform work that the plaintiff had not been performing."[87]  Here, Palmer's former position has not been filled.

Furthermore, Palmer does not dispute that: (1) she and all other CFL employees included in the performance-based salary reduction and determined to have not significantly improved

---

[84]Doc. No. 25, Ex. 22.

[85]Doc. Nos. 22, 27.

[86]*Clark*, 628 F.3d at 471.

[87]*Id*.

were discharged first in the October RIF; (2) in all 23 hourly employees, including employees who were under no type of formal corrective action, were discharged in the October RIF; and (3) before and after the October RIF, 75% of CFL's account managers were over the age of 40.[88]

**CONCLUSION**

Palmer has failed to show that there are material facts in dispute that create a genuine issue as to whether her age or gender was a motivating factor for the territory realignment, performance-based salary reduction, and discharge.  Based on the undisputed facts, no reasonable juror could find that CFL intentionally discriminated against Palmer.  Accordingly, CFL's Motion for Summary Judgment is GRANTED.  All other pending motions are DENIED as MOOT.

IT IS SO ORDERED this 24th day of April, 2013.


/s/Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[88]Doc. No. 27.